UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

ESE A. O'DIAH,                                        :

                              Plaintiff,             :

              -against-                              :        **MEMORANDUM**
                                                             **OPINION AND ORDER**

YOGO OASIS, ROAST BEAN COFFEE,      :
ROAST TOWN COFFEE, and                              11 Civ. 309 (FM)
DONG G. SHIN,                                       :
                              Defendants.
----------------------------------------------------------x

**FRANK MAAS,** United States Magistrate Judge.

          Pro se plaintiff Ese O'Diah ("O'Diah") brings this employment

discrimination suit against his former employer, Yogo Oasis, which operates a café under

the name Roastown Coffee ("Roastown"), and Roastown's owner, Doug G. Shin

("Shin").  In his complaint, O'Diah alleges that he was wrongfully terminated on the basis

of his race, color, and national origin.  He seeks relief under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), and the New York State Human

Rights Law, N.Y. Exec. Law § 296, et seq. ("NYSHRL").[1]  O'Diah also seeks damages

for defamation of character.

---

          [1]     On March 1, 2012, I dismissed a claim in which O'Diah asserted that he had been
terminated in retaliation for reporting certain employee grievances to Shin.  I also dismissed
O'Diah's Title VII claim against Shin, individually, but permitted the NYSHRL claim against
him to go forward.  See O'Diah v. Yogo Oasis, No. 11 Civ. 309 (FM), 2012 WL 691534
(S.D.N.Y. Mar. 1, 2012).

Roastown has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (ECF No. 81).  For the reasons explained below, the motion is denied.

I.      Background

        A.      Local Rule 56.1

        Local Civil Rule 56.1(a) requires a party seeking summary judgment to submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party then is required to provide a counterstatement with "correspondingly numbered paragraph[s]" setting forth a response to each of the paragraphs in the moving party's statement.  See Local Civil Rule 56.1(b).

        Although Roastown served O'Diah with the required notice of the Local Civil Rule 56.1 procedures, (ECF No. 84), O'Diah did not submit any counterstatement.  Ordinarily, a failure to respond to facts set forth in the movant's Rule 56.1 statement results in those facts being deemed admitted.  Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003).  As the Second Circuit has emphasized, however, pro se litigants are entitled to "special solicitude . . . when confronted with motions for summary judgment."  Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988) (citing Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988)).  Thus, notwithstanding a pro se plaintiff's failure to comply strictly with the Local Rules, the Court "retains some discretion to consider the substance of the plaintiff's arguments, where actually supported

2

by evidentiary submissions." Wali v. One Source Co., 678 F. Supp. 2d 170, 178

(S.D.N.Y. 2008); see also Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)

(court has "broad discretion to determine whether to overlook a party's failure to comply

with the local rules").  Considering O'Diah's pro se status, I therefore will consider his

evidence to the extent that it is supported by the record.

B.      Relevant Facts[2]

Shin, a first-generation immigrant from Korea, opened Roastown in June

2009.  (Midwood Decl., Ex. A ¶¶ 4, 7).  The café staff consisted of approximately ten to

twelve employees who apparently hailed from various foreign countries, including

Nigeria, Columbia, Guatemala, South Korea, Morocco, the Dominican Republic,

Indonesia, Egypt, the United States, and Puerto Rico.  (Defs.' Stmt. ¶¶ 4-5).

O'Diah is a black male from Nigeria.  (ECF No. 2 ("Complaint" or

"Compl."), Ex. A at 1).[3]  In June or July of 2009, Shin hired O'Diah to work as a barista

at Roastown.  (Id.; Defs.' Stmt. ¶ 6).  Shin initially was pleased with O'Diah's work and

promoted him to manager.  (Id. ¶ 7).

---

[2]      The background facts are derived principally from Roastown's Local Rule 56.1
statement, as well as the affidavits and exhibits annexed to the parties' respective motion papers.
(See Roastown's Rule 56.1 Statement of Material Facts (ECF No. 80) ("Defs.' Stmt."); Decl. of
Laura Midwood, Esq., sworn to on Oct. 12, 2012 (ECF No. 83) ("Midwood Decl."); Decl. of Ese
A. O'Diah, sworn to on Oct. 23, 2012, (ECF No. 87) ("O'Diah Decl.")).  Unless otherwise noted,
the facts are set forth in the light most favorable to O'Diah.

[3]      Attached to O'Diah's form complaint is a three-page sworn narrative containing
the bulk of O'Diah's factual allegations.  Citations to Exhibit A to the Complaint refer to this
narrative.

According to John Stauble ("Stauble"), one of O'Diah's coworkers, Shin was "rude and cruel" to Roastown employees and made a number of discriminatory remarks about O'Diah's race throughout his employment.  (O'Diah Decl., Ex. 9 (Aff. of John Stauble, sworn to on May 19, 2011 ("Stauble Aff.")), at 1).  On one occasion, Shin instructed O'Diah to tell a group of black men to leave the vicinity of the Roastown storefront, stating "you black guy, tell those black guys [to] go away."  (Id.).  Although O'Diah refused to do so, Shin insisted, stating "black guys [are] bad for business, you black guy, make them leave."  (Id.).  After O'Diah again refused, Shin became angry and poked O'Diah in the chest, stating "damn black guys no good."  (Id.).

During the latter half of his employment at Roastown, O'Diah increasingly found himself in the middle of arguments between Shin and his wife ("Mrs. Shin").  (Compl., Ex. A at 1).  At times, Mrs. Shin would ask O'Diah to perform tasks that conflicted with Shin's orders.  (Id.).  She became "very upset" with O'Diah when he informed her that he had been hired by Shin and would follow Shin's instructions over hers.  (Id.).  According to Juan Lugo ("Lugo"), another one of O'Diah's coworkers, O'Diah would get upset when Mrs. Shin was at the store because "she was his new boss . . . and [Lugo] could tell that O'Diah didn't like taking orders from women"  (Defs.' Stmt. ¶ 28).  One day, O'Diah allegedly told Lugo that he was "sassing" Mrs. Shin "so that he would get fired."  (Id. ¶ 29).

In May 2010, O'Diah informed Shin that he planned to take a three-week vacation in Europe commencing on July 15.  (Id.).[4]  When Shin responded by asking O'Diah where he was from, O'Diah stated that he was from Nigeria.  (Id.).  Shin laughed, but gave O'Diah permission to take the vacation.  (Id.).  Although Shin was under the impression that O'Diah understood that his vacation would be unpaid, O'Diah left a note on Shin's desk the day before he departed, stating that he wished to receive vacation pay.  (Id.; Midwood Decl., Ex. A ¶¶ 13-14).

O'Diah returned from vacation on August 8, 2010.  (O'Diah Decl., Ex. 6).  Around that time, Roastown alleges that Shin and his assistant, Richard Kim ("Kim"), began to notice that the cash registers were "coming up short."  (Defs.' Stmt. ¶¶ 12-13).  After reviewing video recordings from Roastown's surveillance cameras, Shin and Kim discovered footage that they believed showed O'Diah stealing money from the cash registers and the employee tip jar.  (Id. ¶¶ 14-16).

A few days later, O'Diah was called into Shin's office and told that "employee tips were low" while he was on vacation, but "high" ever since he returned.  (Compl., Ex. A at 1).  Shin then showed O'Diah the surveillance tape footage.  (Id.).  After being confronted with the footage, O'Diah admitted taking cash from the registers, but explained that the registers had insufficient change for customers, which required him to exchange money from the register for the smaller bills and coins in the tip jar.  (Id.;

---

[4]     O'Diah's narrative mistakenly states that his vacation began on June 15. (Compl., Ex. A at 1).  His printed airline travel itinerary confirms that his outbound flight in fact was on July 15, with a return date of August 8.  (O'Diah Decl., Ex. 6).

Defs.' Stmt. ¶ 17).  Ensuring that the store had adequate change was apparently Mrs.

Shin's responsibility, but O'Diah explained to Shin that, because she had not been

present, he was forced to "improvise."  (Compl., Ex. A at 1).  O'Diah also stated that he

sometimes took money to the bank in order to get change.  (Defs.' Stmt. ¶ 19).

According to O'Diah, Shin accepted his explanation and apologized, stating that he would

make sure that Mrs. Shin was available more often so that the store had sufficient change.

(Compl., Ex. A at 1).

   Some time later, Shin and his wife again confronted O'Diah about amounts

allegedly missing from the cash register.  (Stauble Aff. at 1).  Stauble, who observed the

scene, heard them asking O'Diah in "raised angry voices" where the missing money had

gone.  (Id.).  After O'Diah insisted that he had not taken any money, Shin shook his head

and said, "fucking Nigerian no good need new manager."  (Id.).  According to Stauble, the

cash discrepancy likely had been caused by an accidental "over ring."  (Id.).

   On August 23, 2010, Shin once again called O'Diah into his office to

confront him with surveillance tape footage that showed O'Diah taking cash from the

register and placing it in his pocket.  (Compl., Ex. A at 2; Defs.' Stmt. ¶ 29).  O'Diah

explained that the register again had run out of change and, because Mrs. Shin was not

present at the store, he needed to run across the street to get more change.  (Compl., Ex. A

at 2).  In response to Shin's inquiry as to why he was reaching under the counter, O'Diah

said that he "had to get the key to [the] safe" to determine whether he needed to get more

change.  (Id.).  Evidently unconvinced by that explanation, Shin directed his assistant to

call the police.  (Id.).  When O'Diah protested that he had no motivation to steal from

Roastown since he had "helped . . . build th[e] store to the way it is now," Shin responded

by pointing his finger and stating:  "You Nigerians can't be trusted."  (Id.).

       While they were waiting for the police to arrive, Shin asked several "Korean

friends" to join them in his office.  (Id. at 3).  O'Diah asked why Shin was inviting these

individuals into the room, but Shin did not respond.  (Id.).  O'Diah also has a website

design business and, at some point during his employment at Roastown, Shin had hired

him to create a website for the café.  (Midwood Decl., Ex. A ¶¶ 25-26).  O'Diah also

wished to gain further website business from local Korean customers and business owners.

He believes that Shin's reason for inviting his Korean friends into the office therefore was

to "humiliat[e]" him "in front of . . . potential clients."  (Pl.'s Mem. of Law in Support of

Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp. Mem.") (ECF No. 87) at 18).

       After the police officers arrived and viewed the surveillance tape, they asked

Shin whether there was any additional evidence of theft.  (Compl., Ex. A at 3).  Although

Shin claimed that O'Diah had stolen at least $60, he conceded to the officers that the "total

sale receipt" did not reflect any missing amounts.  (Id.).  Accordingly, the police

concluded that no theft had occurred.  (Id.).  They further suggested that O'Diah leave the

premises and "take [Shin] to court" for having falsely accused him of stealing.  (Id.).

       According to Lugo, O'Diah stopped on his way out of the café and stated

that he would no longer be working at Roastown.  (Defs.' Stmt. ¶ 39).  When Lugo asked

whether O'Diah had been fired, O'Diah allegedly replied that he had quit and intended to

sue Shin.  (Id.).

On September 7, 2010, O'Diah filed a charge with the Equal Employment Opportunity Commission ("EEOC"). (Compl. at 3). Thereafter, on October 27, 2010, while the EEOC charge was pending, Shin filed a complaint with the New York City Police Department regarding an alleged theft by O'Diah on August 12, 2010. (Midwood Decl., Ex. K at 1). The complaint classified the incident as a "petit larceny," but did not specify any loss amount. (Id. at 2).

On January 10, 2011, after receiving a Notice of Right to Sue letter, O'Diah filed this suit. (Id. at 4; ECF No. 2).

C.     Evidence of Theft

Roastown has submitted two brief surveillance camera video clips, both dated August 12, 2010, which Roastown allegedly used to determine that O'Diah had committed theft. The footage shows O'Diah opening cash registers, reaching under the counter where the tip jar is located, counting money, and placing money into his pants pocket. (See Midwood Decl., Ex. C). The video further indicates that O'Diah accessed the register during the middle of the day, while numerous customers and other employees were in close proximity.

Roastown also has submitted a partial set of the store's daily cash receipt records, which it contends are further evidence of O'Diah's thefts. (Defs.' Reply Mem. of Law in Further Support of Mot. for Summ. J. ("Defs.' Reply") (ECF No. 88), Ex. A). These receipts consist of (1) printed statements reflecting the total amount of sales recorded on the register at the end of each day, and (2) handwritten "sales reports"

reflecting the actual cash counted, total credit card sales, sales grand total, and any cash shortages.  The shortages appear to have been calculated by subtracting the cash tally reflected on each day's handwritten report from the amount of cash purchases indicated on the corresponding printed statements.  By way of example, on August 9, 2010, the printed statement indicates that the store had $1,754.55 in cash sales, while the handwritten report states that the actual amount of cash counted in the register was $1,642.  There consequently was a $112.55 cash shortage for that day.

The records are organized in no particular order and numerous days have inexplicably been excluded.  The records that were provided reflect relatively frequent cash shortages as early as March 8, 2010.  These shortages typically ranged from $70-90 per day, although there were several days on which deficiencies of well over $100 were reported.  There were no indicated shortages from July 17-30, 2010, which was part of the time O'Diah was on vacation.  It is unclear whether there were any shortages during the remaining days O'Diah was absent, since no records were provided for either July 15-16 or July 31 - August 8.  There do appear to be other lengthy periods, however, during which no cash shortage was reported, such as between May 13 and June 20.[5]

---

[5]      As further evidence of O'Diah's alleged thefts, Roastown has provided the unsworn "affidavits" of Bensaid Fouad ("Fouad") and Sam Gad ("Gad"), both of whom were O'Diah's coworkers.  Fouad states that he observed O'Diah "steal money" from the cash register on August 18, 2010, and that another coworker "also said he believes that [O'Diah] in fact stole money" on another occasion.  (Midwood Decl., Ex. H).  Gad's affidavit states that, on August 11, 2010, he saw O'Diah "take money from the cash register and put [it] directly in his pocket." (Id., Ex. I).  According to Gad, O'Diah was neither "helping a customer[, nor] counting tips[, n]or changing shifts."  (Id.).  Gad also allegedly "heard" from other coworkers that O'Diah had "repeated these movements but they weren't sure exactly why."  (Id.).  These affidavits are

(continued...)

9

II.   Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law" based on supporting materials in the record.  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if 'the evidence is such that a reasonable juror could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the governing law.'"  Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party.  Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 78 (2d Cir. 2002) (quoting Gummo v. Vill. of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996)).  To defeat a properly supported motion for summary judgment, however, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the party opposing summary judgment must offer "concrete evidence

---

[5](...continued)
unsworn and do not substantially comply with the requirements of 28 U.S.C. § 1746.  See LeBoeuf, Lamb, Greene & MacRae LLP v. Worsham, 185 F.3d 61, 65-66 (2d Cir. 1999).  Moreover, the statements that they contain are totally conclusory and based in substantial part on hearsay.  For these reasons, the Court will not consider them.

from which a reasonable juror could return a verdict in his favor." <u>Anderson</u>, 477 U.S. at 256; <u>see also</u> <u>FDIC v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010) (non-moving party cannot simply rely on "conclusory allegations or unsubstantiated speculation").

Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court.  <u>Fischl v. Armitage</u>, 128 F.3d 50, 55 (2d Cir. 1997).  Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried."  <u>Id.</u>

The Second Circuit has "emphasized that trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." <u>Chertkova v. Conn. Gen. Life Ins. Co.</u>, 92 F.3d 81, 87 (2d Cir. 1996).  However, "[e]ven in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than some metaphysical doubt as to the material facts."  <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 101 (2d Cir. 2010) (internal quotations and citations omitted).

III.    <u>Analysis</u>

A.    <u>Employment Discrimination Claim</u>

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

To overcome a motion for summary judgment under Title VII, "a discrimination plaintiff must withstand the three-part burden-shifting laid out by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973)."  McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006).  Discrimination claims brought under the NYSHRL are evaluated according to the same burden-shifting framework.  See Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010); Pucino v. Verizon Wireless Communications, Inc., 618 F.3d 112, 117 n.2 (2d Cir. 2010); Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009).

Under the McDonnell Douglas rubric, the plaintiff must satisfy an initial burden of "proving by a preponderance of the evidence a prima facie case of discrimination."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). To establish a prima facie case, an employee must show that:  (1) he was within the protected class; (2) he was qualified for the position he held; (3) he was subjected to an adverse employment decision or discharge; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  See Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012); Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir. 1997).

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment."  Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted). Among the actions that qualify as materially adverse are "a termination of employment, a

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material

loss of benefits, [or] significantly diminished material responsibilities." Id.

      Once the plaintiff makes out a prima facie case, "a rebuttable presumption of

discrimination arises and the burden then shifts to the defendant to articulate a legitimate,

non-discriminatory reason for the employment decision." Sharpe v. MCI Commc'ns

Servs., Inc., 684 F. Supp. 2d 394, 401 (S.D.N.Y. 2010) (quoting Stratton, 132 F.3d at 879).

The purpose of this step is "to force the defendant to give an explanation for its conduct, in

order to prevent employers from simply remaining silent while the plaintiff founders on

the difficulty of proving discriminatory intent." Felder v. Securitcus Sec. Serv., No. 04

Civ. 9501 (LAK), 2006 WL 2627969, at *7 (S.D.N.Y. Sept. 12, 2006) (quoting Fisher v.

Vassar Coll., 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc)).

      Finally, if the defendant provides a nondiscriminatory rationale for its

conduct, the rebuttable presumption drops out of the case. St. Mary's Honor Ctr. v. Hicks,

509 U.S. 502, 510-11 (1993).  The burden then rests on the plaintiff to prove not only that

the proffered nondiscriminatory reason was pretextual, but also that the defendant

discriminated against the plaintiff. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87,

93-94 (2d Cir. 2001).  In other words, the burden shifts back to the plaintiff to prove that

"discrimination was the real reason for the employment action." Graham v. Long Island

R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In most cases there is significant overlap among the three steps in the

McDonnell Douglas framework.  Indeed, whether the plaintiff has met his prima facie

burden of demonstrating an inference of discrimination often is a question

indistinguishable from whether the employer's actions served merely as a pretext for some

disguised discriminatory animus towards the plaintiff.  See Goldman v. Admin. for

Children's Servs., No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *5 (S.D.N.Y. May 29,

2007).  In the end, "the bottom line in a Title VII summary judgment motion is, simply,

whether plaintiff has presented sufficient evidence from which a reasonable trier of fact

could determine that defendants discriminated against her."  Id.; see also Reeves v.

Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) ("Although intermediate

evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, the

ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff remains at all times with the plaintiff") (internal

quotation marks omitted).

1.   Prima Facie Case

O'Diah's evidence clearly is sufficient to establish a prima facie case of

discrimination at the first step of the McDonnell Douglas analysis.  As a black Nigerian,

he is a member of two protected classes.  Ani v. IMI Systems, Inc., No. 98 Civ. 8430

(DAB) (MHD), 2002 WL 1888873, at *5 (S.D.N.Y. Aug. 15, 2002).  The evidence further

demonstrates that O'Diah was qualified for his job as a barista.  Indeed, Roastown

concedes that Shin regarded O'Diah as a "valuable worker" and promoted him.  (Defs.'

Stmt. ¶ 7).  O'Diah's termination qualifies as an adverse employment action.  <u>Sista v.</u>
<u>CDC Ixis N. Am., Inc.</u>, 445 F.3d 161, 169 (2d Cir. 2006).  Finally, the allegations of
Shin's discriminatory remarks, which were made both throughout O'Diah's employment
and at the time of his termination, are sufficient to demonstrate that O'Diah's termination
arose out of circumstances giving rise to an inference of unlawful discrimination.  (<u>See</u>
Compl., Ex. A at 1-3; Stauble Aff. at 1).

       Roastown nevertheless argues that O'Diah has failed to show that he was
qualified for his position because Shin later determined that he had been stealing from the
cash drawer.  Although an acknowledged theft undoubtably would establish unsatisfactory
job performance, <u>see</u> <u>Crews v. Trs. of Columbia Univ. in the City of N.Y.</u>, 452 F. Supp. 2d
504, 522 (S.D.N.Y. 2006), O'Diah denies having stolen any money.  Similarly, although
Roastown's videotapes may be supportive of Shin's claim that he believed O'Diah had
been stealing money, that evidence does not prove conclusively that he did.  Rather,
Roastown's allegations of theft merely confirm the existence of a factual dispute that
cannot be resolved on summary judgment.

       Roastown further argues that O'Diah cannot demonstrate that he suffered an
adverse employment action because he quit voluntarily.  Specifically, Roastown points to
O'Diah's alleged statements to Lugo that he had "quit" and intended to sue Shin.  (<u>See</u>
Lugo Aff. ¶ 12).  Lugo's affidavit, however, is contradicted by O'Diah's allegation that he
was terminated, (<u>see</u> Compl. at 2), and a reasonable fact-finder would be entitled to credit
O'Diah's account.  <u>See</u> <u>Graham v. Kimber Mfg., Inc.</u>, No. 00 Civ. 3295 (GEL), 2002 WL
181698, at * 3-4 (S.D.N.Y. Feb. 5, 2002) (although employer offered "substantial

evidence" that plaintiff had quit his job, it was for the jury to evaluate the credibility of

that evidence, and a reasonable fact-finder would not be required to accept the employer's

version).  Thus, O'Diah's version, which must be accepted for purposes of summary

judgment, supports his claim that he suffered an adverse employment action.

Finally, Roastown maintains that O'Diah has failed to demonstrate facts

sufficient to support an inference of discrimination.  That contention, of course, is belied

by the evidence that Shin made numerous discriminatory remarks concerning O'Diah's

race and national origin throughout his employment at Roastown.  These comments – in

particular, Shin's statement to O'Diah at the time he was fired, that "You Nigerians can't

be trusted" – clearly support the inference that Shin's decision to terminate O'Diah was

motivated by discriminatory animus.

The Second Circuit repeatedly has said that a plaintiff's burden in

establishing a prima facie discrimination case is "minimal."  Roge v. NYP Holdings, Inc.,

257 F.3d 164, 168 (2d Cir. 2001); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d

456, 467 (2d Cir. 2001) ("A plaintiff's burden of establishing a prima facie case is de

minimis.") (citations omitted).  Considering that relaxed standard in the context of the

facts of this case, the evidence unquestionably gives rise to a reasonable inference of

unlawful discrimination.

2.      Legitimate, Nondiscriminatory Reason

Having determined that O'Diah's evidence establishes a prima facie case for

discrimination, the burden shifts to Roastown to demonstrate that it had a legitimate,

nondiscriminatory reason for terminating O'Diah.  Sharpe, 685 F. Supp. 2d at 401.

Roastown contends that O'Diah was fired because he stole money from the cash registers or tip jar on several occasions. Although the evidence in that regard is largely circumstantial, it is sufficient to carry Roastown's limited burden at this stage. See Jowers v. Family Dollar Stores, No. 09 Civ. 2620 (WHP), 2010 WL 3528978, at *3 (S.D.N.Y. Aug. 16, 2010) ("[Defendant's] allegation of theft constitutes a valid reason for termination") (citing Crews, 452 F. Supp. 2d at 523). Therefore, the burden shifts back to O'Diah to demonstrate that Roastown's claimed basis for terminating him was a pretext for discrimination. See Ruiz v. Cnty. of Rockland, 609 F.3d 486, 492 (2d Cir. 2010).

> 3.     Pretext

Pretext may be established "either by persuading the Court that a discriminatory reason more likely motivated the employer, or by showing the defendant's explanation is not credible." Clifford v. Cnty. of Rockland, No. 10 CV 6979 (VB), 2012 WL 2866268, at *6 (S.D.N.Y. June 25, 2012) (citing Burdine, 450 U.S. at 256). In the course of attempting to do so, a plaintiff may rely on the evidence supporting his prima facie case or any additional evidence of discrimination. See Burkhardt v. Lindsay, 811 F. Supp. 2d 632, 652 (E.D.N.Y. 2011).

The evidence in this case clearly would permit a rational jury to conclude that Roastown's stated reason for firing O'Diah is false. Although there is videotape footage showing O'Diah removing money from the cash drawer and placing it in either the tip jar or his pocket, O'Diah explained that the registers ran low on change, requiring him to avail himself of the money in the tip jar or to take larger bills from the register to the bank to obtain additional change. Roastown contends that this explanation is undermined by "store polic[ies]," which apparently prohibited anyone other than Shin from removing

money from the cash registers when not making a sale.  (Defs.' Mem. of Law in Support

of Mot. for Summ. J. (ECF No. 82) ("Defs.' Mem.") at 19).  There is no evidence of any

written policy to that effect.  In any event, even if there were,  the existence of such a

written rule would not undermine O'Diah's explanation, since he did not claim that his

actions were authorized, but, rather, that he did what he believed was reasonably necessary

to keep the store from having to close as a result of running out of change.

      Roastown's daily sales records also cast considerable doubt on the claim that

O'Diah committed theft.  Although the records indicate no reported cash shortages for

fourteen of the days O'Diah was absent in July, Roastown offers no explanation for why it

failed to provide records for the remaining eleven days of his vacation.  The absence of

records for nearly half of O'Diah's vacation is significant, since Roastown claims that the

lack of cash shortages during this period is circumstantial evidence of his theft.  At any

rate, Roastown's theory is belied by the fact that there were several other lengthy periods

of time while O'Diah was working at the café, during which there were no reported cash

shortages.  (See Defs.' Reply, Ex. A at 3).  Indeed, Roastown has claimed no shortages for

the entire period between May 13 and June 20, all of which were days that O'Diah

worked.  Thus, Roastown's sales records fail to establish a link between O'Diah and the

store's alleged cash shortages.

      Other evidence also suggests that O'Diah was not the source of Roastown's

cash shortages.  For example, O'Diah's coworker explained that the reported shortages

may have been the result of accidental "over ring[ing]," rather than theft.  (See Stauble

Aff. at 1).  It also is odd that Shin waited six months to confront O'Diah about the missing

amounts when the records clearly indicate that significant and frequent cash shortages had

been reported as far back as March.  (See Defs.' Reply, Ex. A at 3-4).  Moreover, when the

police were summoned to Shin's office during O'Diah's termination, Shin was unable to

provide the officers with any evidence of theft, and the police concluded that there was no

indication that anything improper had occurred.  (Compl., Ex. A at 3).  Finally, Shin's

two-month delay in filing his criminal complaint with the New York City Police

Department is inconsistent with the notion that theft was the real motivation for his

decision to terminate O'Diah.  (Compl. at 3; Midwood Decl., Ex. K at 1).

        In addition to the substantial evidence that discredits Roastown's stated

reason for terminating O'Diah, there also is evidence from which a rational jury could

determine that O'Diah was terminated for discriminatory reasons.  See Burdine, 450 U.S.

at 256.  Indeed, a number of the remarks Shin is alleged to have made throughout

O'Diah's employment can fairly be construed as evidence of discriminatory motive.

Comments such as "black guys [are] bad for business," "damn black guys no good," and

"fucking Nigerian no good need new manager" all clearly are suggestive of Shin's

discriminatory animus against O'Diah.[6]  Shin's statement to O'Diah that "You Nigerians

can't be trusted" is particularly troubling because it was alleged to have been made during

the meeting at which O'Diah was terminated.  Context matters a great deal in employment

discrimination cases, and the temporal relationship between the discriminatory remark and

the adverse employment action often is highly probative of discriminatory intent.  Berry v.

---

        [6]     This evidence comes directly from Stauble's affidavit, which Roastown claims is
not credible because Stauble "lasted only three months on the job because of his tendency to fall
asleep while working."  (Defs.' Mem. at 18).  Assessing a witness' credibility at the summary
judgment stage, however, is inappropriate.  Donnelly v. Greenburgh Cent. School Dist. No. 7,
691 F.3d 134, 146 (2d Cir. 2012).  Roastown identifies no other reason why Stauble's evidence
should be ignored.

Empire Homes Services LLC, No. CV-06-2354, 2010 WL 1037948, at *8 (E.D.N.Y. Mar. 18, 2010); see also Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 163-64 (2d Cir. 1998) (noting the significance of discriminatory comments made close to the time of plaintiff's discharge).  Drawing all reasonable inferences and resolving all ambiguities in O'Diah's favor, this evidence clearly supports a finding that O'Diah's termination was the product of unlawful discrimination.

Seeking to overcome this basis for the denial of its motion, Roastown contends that "[Shin's] command of English is such that he could not have formulated" expressions such as those alleged by O'Diah.  (Defs.' Mem. at 17).  There is no evidence that this is true, but even if Roastown had retained a speech expert, his testimony would simply establish the existence of an issue of material fact incapable of being resolved on summary judgment.

Roastown's final argument – that Shin would not have discriminated against O'Diah because he hired O'Diah in the first place – is similarly unavailing.  (Defs.' Mem. at 18).  Although a nondiscriminatory inference may be drawn when an employee is hired and fired by the same decisionmaker, see Grady v. Affiliated Cent. Inc., 130 F.3d 553, 560 (2d Cir 1997), "the same-actor inference is permissive, not mandatory."  Memnon v. Clifford Chance US, LLP, 667 F. Supp. 2d 334, 351 (S.D.N.Y. 2009); see also Copeland v. Rosen, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999) ("The 'same actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand.").  In light of Shin's numerous alleged discriminatory comments, Roastown's reliance on the same-actor doctrine seems

particularly inappropriate in this case.  In any event, even if such an inference were

warranted, it still would "not [be] sufficient in itself to justify summary judgment [because

O'Diah] has otherwise raised . . . genuine issue[s] of material fact."  <u>Castagna v. Luceno</u>,

No. 09 Civ. 9332 (ER), 2013 WL 440689, at *4 n.8 (S.D.N.Y. Feb. 4, 2013).

        For these reasons, summary judgment on O'Diah's discrimination claims

must be denied.[7]

    B.   <u>Defamation</u>

        O'Diah's Complaint also charges Roastown with defamation of character.

(Compl. at 4).  Although the Complaint does not elucidate the basis for that claim, O'Diah

has indicated in papers filed in opposition to a previous motion that "Shin falsely accused

him of theft in the presence of several local [Korean] business owners, in an effort to

tarnish O'Diah's name and [] business."  <u>O'Diah</u>, 2012 WL 691537, at *8 (internal

quotation marks omitted).  As noted previously, O'Diah had sought to expand his website

business by attracting Shin's "Korean friends" as customers.  Shin then "humiliat[ed]" him

in front of those "potential clients" by inviting them to watch while Shin reported

O'Diah's alleged theft to the police.  (Pl.'s Opp. Mem. at 18).

        "Defamation is injury to a person's reputation, either by written expression

(libel) or oral expression (slander)."  <u>Lessene v. Brimecome</u>, ___ F. Supp. 2d ___, No. 12

Civ. 3651 (AJN), 2013 WL 154299, at *2 (S.D.N.Y. Jan. 14, 2013).  Under New York

law, slander is defined as "(1) a defamatory statement of fact, (2) that is false, (3)

---

[7]     Although Roastown has focused on O'Diah's Title VII claim, it maintains that summary judgment also should be granted with respect to his NYSHRL claim against Shin. (Defs.' Mem. at 21).  Because that contention is based on the mistaken assumption that O'Diah's Title VII claim will be dismissed, there is no need to address it further here.

published to a third party, (4) of and concerning the plaintiff, (5) made with the applicable

level of fault on the part of the speaker, (6) either causing special harm or constituting

slander per se, and (7) not protected by privilege." Albert v. Loksen, 239 F.3d 256, 265-

66 (2d Cir. 2001). Ordinarily, to recover on a defamation claim, a plaintiff must allege

"special damages," which is a term equated with "the loss of something having economic

or pecuniary value." Liberman v. Gelstein, 80 N.Y.2d 429, 434-35 (1992). Special

damages need not be shown, however, where evidence supports a claim for slander per se.

Albert, 239 F.3d at 271. The four categories of defamatory statements that constitute

slander per se are those that "(1) charge the plaintiff with a serious crime; (2) tend to injure

the plaintiff in his or her trade, business or profession; (3) imply that the plaintiff has a

loathsome disease; or (4) impute unchastity to a woman." Id.

        An accusation of theft constitutes an allegation of a "serious crime." Epifani

v. Johnson, 882 N.Y.S.2d 234, 243 (2d Dep't 2009). O'Diah's allegations therefore

sufficiently set forth a case for slander per se.[8] Roastown's sole argument to the contrary

is that O'Diah "cannot prove that [the] alleged defamatory statement, namely, that he stole

money from his employer, is false." (Defs.' Mem. at 22). This misses the point.

O'Diah's evidence establishes that there is a genuine factual issue as to whether

---

        [8]        At first blush, it might seem as though Shin's comments also qualify as
statements injurious to O'Diah's business or trade. However, "[c]ourts have consistently held
that any allegedly defamatory statements that do not affect a plaintiff's actual business
profession, rather than simply qualities that are important for business, are not defamatory per
se." Kalimanto GmbH v. Motion in Time, Inc., ___ F. Supp. 2d ___, No. 12 Civ. 6969 (PAE),
2013 WL 1499408, at *21 (S.D.N.Y. Apr. 12, 2013) (statements accusing plaintiff of stealing a
Patek Phillipe watch were irrelevant to his status as a wholesaler of foodstuffs). The allegation
that O'Diah had stolen cash from Roastown is unrelated to his skills in the website design or
barista business. Thus, no slander per se action lies on the basis that Shin's statements were
injurious to O'Diah's business.

Roastown's allegations of theft were true. That is all that is necessary at the summary judgment stage. Accordingly, the motion for summary judgment with respect to O'Diah's defamation claim must be denied.

IV.   Conclusion

For the foregoing reasons, Roastown's motion for summary judgment, (ECF No. 81), is denied, and the Clerk of the Court is requested to terminate the motion from the docket.

A final pretrial conference shall be held on September 4, 2013, at 10 a.m., in Courtroom 20A of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York. Trial shall commence on October 7, 2013.

SO ORDERED.

Dated:      New York, New York
            July 22, 2013

_____
            FRANK MAAS
       United States Magistrate Judge

Copies to:

Ese A. O'Diah (by United States Mail)
82-50 135th Street, Apt. 1D
Kew Gardens, New York 11435

Laura Midwood, Esq. (by ECF)
Rha & Kim, LLP
215-45 Northern Blvd., Suite 200
Bayside, New York 11361